UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYRONE HUNT, | No. 2:14-cv-1286 MCE CKD P |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| L. TURNER, et al., | |
| Defendants. | |

I. Introduction

Plaintiff, a state prisoner proceeding with counsel and in forma pauperis, has filed this civil rights action seeking relief under 42 U.S.C. § 1983. This action proceeds on the First Amended Complaint, in which plaintiff alleges that defendant Turner violated his Eighth Amendment right to be free from excessive force when she shot him with a foam baton round in April 2013. (ECF No. 24 ("FAC"); see ECF No 26). Before the court is Turner's motion for summary judgment (ECF No. 47), which has been briefed by the parties. (ECF Nos. 51 & 52.) For the reasons discussed below, the undersigned will recommend that defendant's motion be granted.

II. Summary Judgment Standards Under Rule 56

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

1  Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by
2  "citing to particular parts of materials in the record, including depositions, documents,
3  electronically stored information, affidavits or declarations, stipulations (including those made for
4  purposes of the motion only), admissions, interrogatory answers, or other materials. . ." Fed. R.
5  Civ. P. 56(c)(1)(A).
6       Summary judgment should be entered, after adequate time for discovery and upon motion,
7  against a party who fails to make a showing sufficient to establish the existence of an element
8  essential to that party's case, and on which that party will bear the burden of proof at trial. See
9  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an
10  essential element of the nonmoving party's case necessarily renders all other facts immaterial."
11  Id.
12       If the moving party meets its initial responsibility, the burden then shifts to the opposing
13  party to establish that a genuine issue as to any material fact actually does exist. See Matsushita
14  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the
15  existence of this factual dispute, the opposing party may not rely upon the allegations or denials
16  of their pleadings but is required to tender evidence of specific facts in the form of affidavits,
17  and/or admissible discovery material, in support of its contention that the dispute exists or show
18  that the materials cited by the movant do not establish the absence of a genuine dispute. See Fed.
19  R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the
20  fact in contention is material, i.e., a fact that might affect the outcome of the suit under the
21  governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,
22  Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is
23  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving
24  party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).
25       In the endeavor to establish the existence of a factual dispute, the opposing party need not
26  establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual
27  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
28  trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce

the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

III. Discussion

A. Facts

1. Plaintiff's Allegations

In the FAC, plaintiff alleges as follows[1]:

Plaintiff was a prisoner at California State Prison-Sacramento ("CSP-Sac"), where defendant was employed as a correctional officer. (FAC, ¶¶ 4-5.) On April 2, 2013, defendant was stationed on C-Facility, where plaintiff was housed. (Id., ¶¶ 5, 11.) Plaintiff was talking to inmates on the exercise yard when inmate Ramos "started attacking and beating Plaintiff on surveillance video in front of approximately one hundred prisoners." (Id., ¶ 12.)

While plaintiff struggled to break free from Ramos, defendant said, "I've been waiting to shoot this fuckin' police beater," then "grabbed her 40mm firearm and aimed at Plaintiff's face and fired, hitting Plaintiff directly in the right eye[.]" (Id., ¶ 13.) When she saw her round hit plaintiff in the eye, defendant said: "Yes, I shot that fucker right between the eyes, that the

---

[1] The FAC is not signed under penalty of perjury.

3

1  Warden said if you have a problem with a fucker to shoot them as soon as they get into it with
2  someone." (Id., ¶ 14.)
3      Upon being hit, plaintiff lost vision in both eyes, became dazed, and started experiencing
4  severe pain while still being attacked. (Id., ¶ 15.) He was taken to the C-Facility medical clinic
5  and then transported to U.C. Davis Medical Center for emergency treatment. (Id., ¶ 18.) Plaintiff
6  underwent emergency surgery to restore his right eye, but the surgery was unsuccessful. (Id., ¶
7  18.) A doctor told him that he may not regain vision in his right eye and that all the bones around
8  the eye were broken. (Id., ¶ 20.) On April 3, 2013, doctors performed tests on plaintiff's brain
9  and notified him that his brain had been injured by the previous day's shot. (Id., ¶ 23.)
10     Plaintiff contends that defendant "was not acting in a good faith effort to restore discipline
11 or order, but was maliciously and sadistically inflicting harm and pain on Plaintiff." (Id., ¶ 29.)
12 He further asserts that defendant violated department policy on the use of force. (Id., ¶ 43.)
13     Plaintiff attaches various medical and administrative records to the FAC.
14 2. Evidence on Summary Judgment
15     Based on several submitted declarations, the transcript of plaintiff's deposition[2], and the
16 surveillance videotape of the incident, defendant sets forth the following factual account:
17     Plaintiff and inmate Ramos began to fight at approximately 9:20 a.m. on April 2, 2013,
18 while both inmates were on the Facility C exercise yard. (Def.'s Separate Statement of
19 Undisputed Facts (SSUF) 6.) Defendant was the Building C-2 Control Booth Officer manning
20 the 40 millimeter-foam-baton launcher at that time. (SSUF 7.) Defendant heard a radio
21 transmission to "put the yard down" at approximately 9:20 a.m. because of inmate disturbances
22 that were occurring on the yard. (SSUF 8.) From the C-2 Control Booth window, defendant saw
23 plaintiff and Ramos fighting near a table and light pole in front of the basketball court,
24 approximately 90 feet away from her position in the window. (SSUF 10.) Both inmates were
25 punching each other in the upper torso and head. (SSUF 11.)
26     The fight between plaintiff and Ramos was captured on video by surveillance cameras.
27
28 [2] Excerpts of plaintiff's deposition transcript are attached at ECF No. 47-2, Def.'s MSJ, Ex. E.

(SSUF 12.) Plaintiff has reviewed this video footage (SSUF 14), and the undersigned has also reviewed it. (<u>See</u> ECF No. 47-3, Notice of Lodgment of Def.'s Ex. D.) Defendant submits the declaration of Correctional Officer D. Fields, who was the Facility C Yard Officer at CSP-Sac in April 2013. (ECF No. 47-8, Fields Decl.) Fields personally interacted with plaintiff and Ramos and "can easily identify them in photographs and video footage." (<u>Id.</u>) Having reviewed the video footage of the incident, Fields described the events depicted. (<u>Id.</u>; <u>see</u> SSUF 15-43.)

The video shows a fight break out between plaintiff and Ramos, plus a separate fight by two other inmates on the yard. A third inmate joins the latter fight. (SSUF 20-26.) Plaintiff and Ramos fall to the ground near the light pole, struggle, get up, move to the edge of the basketball court, move back to the light pole, then "tumble onto the picnic table." (SSUF 27-33.) "[T]he video captures Plaintiff throwing multiple overhand punches at inmate Ramos as Ramos is lying on the picnic table." (SSUF 34.) They continued to fight until plaintiff "tumbled off the table because . . . he was shot with [a] 40 millimeter direct-impact-round. . . . [H]e remains on the ground until . . . he begins to stand up and back up toward the 'skirmish line' that the correctional officers established on the other side of the basketball court." (SSUF 35-37.)

During this time, plaintiff "was not trying to disengage from Ramos's grasp, but was an active participant in the fight, throwing multiple punches at inmate Ramos." (SSUF 39.)

Non-defendant correctional officers attempted to break up the fights occurring on the yard. "Correctional Officer Pizarro ordered Plaintiff and inmate Ramos to get down, but both inmates ignored this order and continued to punch and strike each other in the upper torso and face with their closed fists." (SSUF 49.) Pizarro "therefore tossed a oleoresin capsicum (O.C.) instantaneous blast grenade from approximately twenty feet away." (SSUF 50.) The grenade exploded three feet from plaintiff and Ramos, but "appeared to have little to no effect because both inmates continued to fight." (SSUF 51-52.)

Another correctional officer, Villasenor, observed plaintiff and Ramos fighting by the light pole and ordered the inmates to get down. (SSUF 65-66.) "Both inmates ignored this order and continued to fight." (SSUF 67.) Villasenor fired a 40-millimeter-foam-baton round, aiming at plaintiff's left thigh. (SSUF 68.) When the fight continued, Villasenor fired another round at

5

1   plaintiff's left thigh.  (SSUF 69.)   As the inmates continued to fight, Villasenor fired a third
2   round at plaintiff's left thigh.  (SSUF 72.)   Villasensor also fired baton rounds at the three inmates
3   fighting elsewhere on the yard.  (SSUF 73-77.)

4       A third non-defendant correctional officer, Sivyer, observed plaintiff and Ramos fighting
5   from his position in the C-2 Control Tower window and yelled orders to get down on the ground.
6   (SSUF 78-83.)  "The two inmates ignored his orders and continued fighting."  (SSUF 84.)  Sivyer
7   fired a foam-baton round at Ramos's right leg from approximately 80 feet away.  (SSUF 85.)  The
8   round struck Ramos in the lower back, but the two inmates continued to fight.  (SSUF 86-87.)
9   Ramos was also struck by rounds in the right shoulder and right leg.  (SSUF 91-104.)  As the
10  group of three inmates continued to fight elsewhere on the yard, Sivyer fired baton rounds at one
11  of those inmates.  (SSUF 105-111.)  "All five inmates continued to fight in two groups."  (SSUF
12  116.)

13      During the entire time defendant saw the altercation, plaintiff was actively engaged in the
14  fight with Ramos.  (SSUF 151.)  Defendant aimed her baton launcher at Ramos's back and fired
15  one round from approximately 90 feet away.  (SSUF 135.)  She did not see where this round
16  struck.  (SSUF 136.)  Defendant reassessed the situation and saw that plaintiff and Ramos were
17  both still fighting.  (SSUF 137.)

18      Defendant reloaded the baton launcher and aimed at Ramos's back right-thigh area.
19  (SSUF 138.)  As she fired the shot, she could see plaintiff, who was facing toward her, lower his
20  head and upper body.  (SSUF 139.)  Defendant saw the round strike plaintiff in the upper facial
21  area.  (SSUF 140.)   Both inmates stopped fighting after defendant fired the second shot, and lay
22  on the ground in a prone position.  (SSUF 141.)  Responding staff on the skirmish line then
23  handcuffed and escorted the involved inmates off the yard.  (SSUF 142.)

24      Defendant never used force against plaintiff with a malicious or sadistic intention.  (SSUF
25  143.)  Defendant never said or yelled out the window that she was waiting to shoot plaintiff,
26  wanted to shoot him, or celebrated the fact that he was hit.  (SSUF 154.)  Defendant had no
27  personal animosity toward plaintiff, but used force in an attempt to break up the fight between
28  plaintiff and Ramos, thereby protecting them and other inmates and officers on the yard.  (SSUF

149, 156-157.) Defendant did not intend for the baton round to strike plaintiff, but it did because of the constant movement of each inmate during the fight. (SSUF 150.)

Inmate fights can easily escalate, with the larger inmate population joining in the fight and inflicting further harm and injury upon the inmates and the correctional officers trying to subdue the disturbances. (SSUF 145.) It is therefore best to try to bring about a safe and quick end to these disturbances through a reasonable use of force. (SSUF 146.) Similarly situated officers with the same training, and faced with the same circumstances, as defendant would believe it was reasonable to utilize the 40 millimeter-foam-baton launcher. (SSUF 148.)

In opposition to summary judgment, plaintiff submits one exhibit: a three-page document described as "the training received by Defendant" (ECF No. 51 at 4) and characterized by defendant as "prison policy." (ECF No. 52 at 5.) This document states that "staff shall not deploy impact munitions at a target when there is not a reasonable chance of striking the intended zone." (ECF No. 50-2 at 1.) "When deploying impact munitions at inmates that are moving in an erratic manner, such as during a fight, good judgment must be exercised to avoid striking unintended zones." (Id.) The document further states that Zone 1 – defined as "from the waist down, [including] legs, buttocks, and feet" – "is the only authorized zone to target during less lethal situations." (Id. at 2.) "Zone 3, which includes the torso and head, is not to be targeted" unless "there is immediate threat of death or great bodily injury." (Id. at 3.)

B. Legal Standard for Excessive Force

The Eighth Amendment prohibits cruel and unusual punishment. "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Whitely v. Albers, 475 U.S. 312, 319 (1986). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Wilkins v. Gaddy, 559 U.S. 34, 37-38 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)) (internal quotations omitted).

Not every malevolent touch by a prison guard gives rise to a federal cause of action. Wilkins, 559 U.S. at 37 (quoting Hudson, 503 U.S. at 9) (quotation marks omitted). In

determining whether the use of force was wanton and unnecessary, courts may evaluate the extent of the prisoner's injury, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7 (quotation marks and citations omitted). While the absence of a serious injury is relevant to the Eighth Amendment inquiry, it does not end it. Hudson, 503 U.S. at 7. The malicious and sadistic use of force to cause harm always violates contemporary standards of decency. Wilkins, 559 U.S. at 37 (quoting Hudson, 503 U.S. at 9) (quotation marks omitted). Thus, it is the use of force rather than the resulting injury which ultimately counts. Id. at 1178.

C. Analysis

Plaintiff offers little to rebut defendant's evidence that multiple correctional officers, including defendant, observed plaintiff actively fighting with Ramos – a fight that continued despite repeated attempts to stop it and prevent the violence from spreading.

Plaintiff testified in deposition that his hands were at his sides, and he was not fighting with Ramos, when defendant shot him with the foam baton round. (ECF No. 47-2 at 26.) This assertion is belied by the videotape, however, and the fact that the fight was mutual cannot be reasonably disputed. See F.T.C. v. Publishing Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

Plaintiff offers evidence suggesting that defendant violated prison policy on the use of impact munitions. It appears the policy required such weapons to be aimed below the waist unless there was an immediate threat of death or great bodily injury. Defendant declares that she was aiming at Ramos' lower body and inadvertently hit plaintiff in the face because both inmates were constantly moving. At any rate, even assuming defendant violated prison policy, this alone is not enough to incur liability under the Eighth Amendment. See Cousins v. Lockyer, 568 F.3d 1063, 1070 (9th Cir. 2009) (alleged failure to follow prison policy does not establish federal constitutional violation).

////

1  Insofar as plaintiff's opposition consists of unsupported assertions (e.g., "Defendant knew that firing the cannon at two moving, erratic targets could very easily kill or seriously injure either Mr. Hunt or Mr. Ramos" (ECF No. 51 at 8)), a party cannot create a genuine issue of material fact simply by making assertions in its legal memoranda. Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1337 (Fed. Cir. 2010) (mere denials or conclusory statements are insufficient to survive summary judgment); In re Ahaza Systems, Inc., 482 F.3d 1118, 1122, fn.1 (9th Cir. 2007) (counsel's arguments and statements are not evidence and do not create issues of material fact issues capable of defeating otherwise valid motion for summary judgment).

Here, despite the fact that plaintiff was seriously injured, there is no evidence that defendant's use of force was malicious and sadistic under the circumstances. Thus the undersigned will recommend that defendant's motion for summary judgment be granted.

Accordingly, IT IS HEREBY RECOMMENDED that defendant's motion for summary judgment (ECF No. 47) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: May 3, 2016

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2 / hunt1286.sj